BRADLEY M. CAMPBELL LLC
  Bradley M. Campbell, Esq.
  Edward R. Bonanno, Esq.
50 West State Street, Suite 1100
Trenton, New Jersey 08608
609-392-4500
brad@bradcampbell.us
  *Attorneys for Plaintiffs Paulsboro Public Schools*
  *And the Borough of Paulsboro*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAULSBORO PUBLIC SCHOOLS AND THE BOROUGH OF PAULSBORO, NEW JERSEY,<br><br>Plaintiffs,<br><br>vs.<br><br>CONSOLIDATED RAIL CORPORATION,<br><br>and<br><br>NORFOLK SOUTHERN RAILWAY COMPANY a/k/a NORFOLK SOUTHERN CORPORATION,<br><br>and<br><br>CSX TRANSPORTATION, INC.,<br><br>Defendants. | CIVIL ACTION<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br>Docket No. _____ |

**COMPLAINT**

1.      This is an action for money damages arising from negligent acts and/or omissions by the Defendants Consolidated Rail Corporation (Conrail), Norfolk Southern Railway Company, a/k/a Norfolk Southern Corporation, and CSX Transportation Inc., all

of which owed and breached duties of care to the Plaintiffs Paulsboro Public Schools (the Schools or PPS) and the Borough of Paulsboro (Paulsboro or the Borough).   The defendants' breaches proximately caused damages to the Schools and the Borough, and both the damages and the affected plaintiffs were reasonably foreseeable.

## PARTIES

2.      Paulsboro Public Schools, a governmental corporate body with offices at 662 North Delaware Street, Paulsboro, New Jersey 08066, operates and at all times relevant to the complaint operated the public school system serving the Borough of Paulsboro.

3.      Plaintiff Borough of Paulsboro, a governmental corporate body with offices at 1211 Delaware Street, Paulsboro, New Jersey 08066, is the municipal government where the cause of action arose.

4.      Defendant, Consolidated Rail Corporation is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania with its principal place of business and/or corporate headquarters located at 1717 Arch Street, 32nd Floor, Philadelphia, Pennsylvania 19103.

5.      Defendant, Norfolk Southern Railway Company, a/k/a Norfolk Southern Corporation, is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia with its principal place of business located at Three Commercial Place, Norfolk, Virginia 23510.

6.      Defendant, CSX Transportation, Inc. is a corporation duly organized and

existing under and by virtue of the laws of the Commonwealth of Virginia with its principal place of business and/or corporate headquarters located in Jacksonville, Florida, and an office for the service of legal process at 2704 Commerce Drive, Suite B., Harrisburg, Pennsylvania 17110.

7.     At all times material hereto, none of the defendants was a citizen of, and none had a principal place of business in, the State of New Jersey.

## JURISDICTION AND VENUE

8.     Jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. 1332(a) in that neither of the plaintiffs is from the same state as any of the defendants and the amount in controversy exceeds $75,000.00.

9.     Venue is proper in this district because plaintiffs reside in this District of New Jersey, the cause of action arose in this district, and many of the acts and omissions constituting Defendants' negligence occurred in this district.

## THE DERAILMENT

10.     All the acts alleged to have been done or not to have been done by the defendants, were done or not done by their respective agents, servants, workmen and/or employees, acting in the course and scope of their employment for and on behalf of said defendants.

11.     On or about the morning of November 30, 2012, and for some time prior thereto, the defendants, jointly and severally, owned a certain bridge known as the

3

Paulsboro Bridge, which spanned the Mantua Creek, in Paulsboro, Gloucester County, New Jersey.

12.     On or about the morning of November 30, 2012, and for some time prior thereto, the defendants, jointly and severally, controlled a certain bridge known as the Paulsboro Bridge, which spanned the Mantua Creek, in Paulsboro, Gloucester County, New Jersey.

13.     On or about the morning of November 30, 2012, and for some time prior thereto, the defendants, jointly and severally, managed a certain bridge known as the Paulsboro Bridge, which spanned the Mantua Creek, in Paulsboro, Gloucester County, New Jersey.

14.     On or about the morning of November 30, 2012, and for some time prior thereto, the defendants, jointly and severally, maintained a certain bridge known as the Paulsboro Bridge, which spanned the Mantua Creek, in Paulsboro, Gloucester County, New Jersey.

15.     On or about the morning of November 30, 2012, and for some time prior thereto, the defendants, jointly and severally, operated a certain bridge known as the Paulsboro Bridge, which spanned the Mantua Creek, in Paulsboro, Gloucester County, New Jersey.

16.     On or about the morning of November 30, 2012, and for some time prior thereto, the defendants, jointly and severally, were responsible for a certain bridge known as the Paulsboro Bridge, which spanned the Mantua Creek, in Paulsboro, Gloucester County, New Jersey.

17.     The aforementioned bridge was built in approximately the year 1873.

18.     The aforementioned bridge is a "swing bridge" and can be positioned open to permit water travel to proceed along the Mantua Creek or positioned closed to permit rail traffic to proceed over the Mantua Creek.

19.     During the approximate year prior to November 30, 2012, the defendants, jointly and severally, individually and/or through their respective agents, servants, workmen and/or employees, received no less than 23 "trouble tickets" reporting that the Paulsboro Bridge had malfunctioned.

20.     Since October 27, 2012, approximately one month prior to this accident, the defendants jointly and severally, individually and/or by their respective agents, servants, workmen and/or employees, received at least nine "trouble tickets" reporting the improper operation of the subject bridge and/or malfunctioning of the subject bridge.

21.     On November 19, 2012, ten days before the subject accident, a rail crew reported to the defendants that the subject bridge had malfunctioned in that the track on the bridge failed to property connect and lock with the track on either side of the bridge.

22.     Approximately eight hours before the subject accident, another train crew reported to the defendants that the subject bridge had malfunctioned and failed to operate properly.

23.     Federal and state laws and regulators required that the subject bridge be inspected every three months.

24.     An inspection of the subject bridge should have been performed in September, 2012.

5

25.     However, the defendants jointly and severally, individually and/or by their respective agents, servants, workmen and/or employees, failed to perform the mandated inspection of the bridge in September, 2012 and/or failed to properly perform said inspection.

26.     Prior to this accident, the defendants had employed a human operator whose job was to move the bridge into the proper position, lock the bridge to the tracks on either side of it, and inspect to make certain that the bridge was properly aligned and locked with the adjacent rails before any trains were permitted to move over the bridge.

27.     Further, prior to this accident, in an attempt to save money, the defendants, jointly and severally, individually and/or through their respective agents, servants, workmen and or employees, eliminated the human bridge operator position and replaced the human bridge operator with an electronic/mechanical system.

28.     On the morning of November 30, 2012, one of the defendants' train crews proceeded to remotely move the Paulsboro Bridge into its position to enable their train to travel over the Mantua Creek and further proceeded to remotely lock the tracks on the bridge to the tracks on either side of the bridge.

29.     The bridge and its signal system were designed to present a green signal when in its proper position and when the track was properly locked.  The bridge was also designed to present a red signal when the bridge was not properly positioned, or the track on the bridge was not properly locked to the track on either side of the bridge.

30.     On the morning of November 30, 2012, even though the train crew had used the remote control to properly align and lock the bridge, the signal remained red.

6

31. The defendants' train crew contacted the defendants' dispatcher and requested permission to cross the bridge despite the presence of a red signal.

32. On the morning of November 30, 2012, despite the presence of a red signal, the defendants' dispatcher authorized the same crew to travel across the Paulsboro Bridge.

33. As the train was traveling across the defendants' Paulsboro Bridge, the train derailed and four tank cars fell off of the bridge into the Mantua Creek below.

34. At or about the same time, the defendants' Paulsboro Bridge began to collapse.

35. One of the tank cars that derailed and was breached contained vinyl chloride and/or other toxic and dangerous substances and the vinyl chloride and/or other toxic and dangerous substances were released from the car into both the water and the ambient, ground level air.

36. The aforementioned accident was caused by the joint and several negligence of the defendants, individually and/or through their respective agents, servants, workmen and/or employees, including but not limited to the following:

      a. Failure to repair the subject bridge;

      b. Failure to properly discover the defective, malfunctioning and unsafe condition of the subject bridge;

      c. Failing to repair the subject bridge;

      d. Failing to properly maintain the subject bridge;

      e. Failing to heed prior complaints that the subject bridge failed to operate properly, failed to properly align and failed to properly lock;

f.      Failing to heed the complaint of other crews both ten days before the accident and hours before this accident concerning the failure of the subject bridge to properly operate, properly align and properly lock;

g.      Permitting a train to operate over the subject bridge even though there was a red signal that indicated that the bridge was not properly aligned and/or was not properly locked;

h.      Failure to have properly trained personnel to detect the condition of the bridge, and whether the ridge was properly aligned and locked, prior to permitting the train to operate over it despite a red signal;

i.      Failure to have a human bridge operator who was trained to operate the bridge and to inspect it prior to any train travel over it;

j.      Failing to perform the mandated quarterly inspection of the subject bridge;

k.      Permitting hazardous, toxic, and extremely dangerous and poisonous substances to be transported across the bridge despite the presence of a red signal indicating that the bridge was not properly aligned and/or locked;

l.      Failing to take necessary and proper precautions for the safety of those individuals living, working, and otherwise situated in the vicinity of the subject bridge;

m.      Failing to warn those individuals living, working, and otherwise situated near the subject bridge that a hazardous substance was being transported across the bridge despite the fact that the defendants, jointly and severally, knew

or should have known that it was unsafe to operate a train across the bridge under the circumstances existing on the morning of November 30, 2012;

n.     Violating statutes of the United States of America and the State of New Jersey, and regulations of federal and state departments and agencies with respect to the subject bridge and the movement of train traffic across it;

o.     Failure to take necessary precautions despite engaging in an ultra-hazardous activity;

p.     Failure to properly inspect, maintain and repair the signal system associated with the subject bridge;

q.     Failure to comply with the defendants' own safety, operating and other rules, procedures and regulations;

r.     Failure to comply with Northeast Operating Rules Advisory Committee (NORAC) Rules;

s.     Failure to have a qualified bridge mechanic or engineer, signal maintainer or signal department personnel, or maintenance of way personnel inspect the bridge and the tracks before permitting the train to travel over the bridge despite the red signal;

t.     Permitting and/or directing untrained and unqualified personnel to make the decision to proceed over the bridge despite the presence of the red signal.

37.     As a result of the negligence, carelessness, and recklessness of the defendants, individually and through their respective agents, servants, workmen and/or employees, each of the plaintiffs were caused to close facilities and take other measures

to protect school students from contact with, and ingestion and inhalation of, vinyl chloride and other dangerous and toxic fumes and substances released into the water and the atmosphere by the rail cars that derailed and/or fell off of the bridge.

38.    The National Transportation Safety Board (NTSB) undertook a comprehensive investigation of the derailment, which investigation included the examination of physical evidence; review of the Defendants' practices and procedures, the taking of witness testimony; and the convening of plenary quasi-adjudicatory hearings at which the Defendants' representatives had the opportunity to present testimony and question witnesses.

39.    On or about July 29, 2014, the NTSB released its preliminary report, including its probable cause determination and safety recommendations, on the Paulsboro derailment.  The NTSB's report, among other findings, determined that the derailment was caused in significant part because one or more Defendants:

   a.    allowed the train to proceed past the red signal aspect with the rail slide locks not fully engaged, which allowed the bridge to rotate and misalign the running rails as the train moved across it;

   b.    relied on a training and qualification program that did not prepare the train crew to examine the bridge lock system;

   c.    lacked a comprehensive safety management program that would have identified and mitigated the risks associated with the continued operation of the bridge despite multiple bridge malfunctions of increasing frequency.

## COUNT 1

## PAULSBOROUGH PUBLIC SCHOOLS VS. CONSOLIDATED RAIL CORP., NORFOLK SOUTHERN RAILWAY COMPANY, a/k/a NORFOLK SOUTHERN CORP., AND CSX TRANSPORTATION, INC.

40.    The foregoing averments are reasserted and realleged as though fully set forth herein.

41.    The defendants regularly moved hazardous substances through the community of Paulsboro.

42.    In regularly moving trains transporting hazardous substances through the populous community of Paulsboro, the defendants jointly and severally owed a duty of care to the Paulsboro Public Schools, which has facilities in the immediate vicinity of the Defendants' railroad right-of-way.

43.    The defendants breached their duty of care to the plaintiffs in the previously recited acts/omissions causing or contributing to the derailment on November 30, 2012.

44.    The defendants' breaches of their duty of care proximately caused the Schools to suffer injury and damages.

45.    Both the Schools and the injury and/or damages the Schools suffered as a result of the defendants' breach of their duty of care were reasonably foreseeable, because the defendants knew or reasonably should have known of the proximity of the Schools' facilities to the railroad right-of-way over which defendants transported hazardous substances, knew or reasonably should have known of the composition of the community, and knew or reasonably should have known that an accident involving the

release of hazardous substances would deprive the Schools of instruction days or their equivalent.

46.     As a result of he aforesaid derailment, the Schools suffered closure of the schools, a cessation of and interruption of curriculum, and later absenteeism, which in sum were the equivalent to a loss of six days of curricular instruction.

47.     The Schools' student body is comprised of a high proportion of low-income and minority students, for whom an interruption in continuous days of instruction has a disproportionate and adverse effect.

48.     Based on costs to produce, each day of instruction in the Schools has a value of approximately $134,223.00.

49.     As a result of the breach of their duties and the resulting derailment herein referred to, the Defendants caused the Schools to suffer: the lost six equivalent days of instruction, with a value to the Schools of approximately $805,339.00; the incurrence of approximately $60,000.00 in other unbudgeted costs.  Provision of instruction to remedy the loss, given the composition of the Schools' student body, will cost at least the amount identified with the per diem cost of lost instruction days.

## COUNT II

## BOROUGH OF PAULSBORO, NEW JERSEY

## AND PAULSBOROUGH PUBLIC SCHOOLS VS. CONSOLIDATED RAIL

## CORP., NORFOLK SOUTHERN RAILWAY COMPANY, a/k/a NORFOLK

## SOUTHERN CORP., AND CXS TRANSPORTATION, INC.

50.     The foregoing averments are reasserted and realleged as though fully set forth herein.

51.     The Paulsboro Public Schools relies for its operation on the receipt of a portion of property taxes collected in the Borough of Paulsboro, which generally amounts to approximately forty-two percent (42%) of property tax collections.

52.     The Borough relies for its operation on the receipt of a portion of property taxes collected in the Borough of Paulsboro, which generally amounts to approximately thirty-eight percent (38%) of property tax collections, plus an additional one percent (1%) that must be devoted to the public library.

53.     Property tax receipts are a function both of the applicable tax rate and the assessed value of homes.

54.     For weeks following the derailment, local print, broadcast, cable, and internet media ran daily, graphic footage and narrative descriptions depicting the derailment and the release of hazardous substances into the community.

55.     In the months following the derailment and through to the present day, any significant or newsworthy development concerning the derailment herein described, from

the filing or prosecution of litigation to periodic proceedings and reports from the NTSB, results in local print, broadcast, cable, and internet media running daily, graphic footage and narrative descriptions depicting the derailment and the release of hazardous substances into the community.

56.   As a result of the accident herein referred to, the stigma associated with the Borough as a proximate result of Defendants' negligence has caused a loss of assessed property values, and/or a deceleration of the rate increase of assessed value increases compared to other comparable communities, that is reducing and for many years will continue to reduce the revenues available to the Borough and the Schools for their respective operations.

57.   Defendants knew or reasonably should have known that both the Borough and the Schools would, in the event of an accident like that herein referred to, proximately cause the injury and/or damages the Borough and the Schools are suffering and will continue to suffer as a result of the defendants' breach of their duty of care. Such injury and/or damages were reasonably foreseeable, because the defendants knew or reasonably should have known of the reliance of the Borough and Schools on property tax revenues, and knew or reasonably should have known that a derailment involving the release of hazardous substances would have a significant and adverse impact on residential property values in the community.

58.   As a consequence of the defendants' negligence and the resulting impact on property values, the Borough and the Schools anticipate a combined loss of operating

revenue over ten (10) years, using a six percent discount rate, of approximately $5,000,000.00, or such greater or lesser amount as is determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand upon each of the foregoing Counts the following relief:

1.    A declaration that the defendants are jointly and severally liable for the damages herein complained of; and

2.    A judgment for compensatory damages, in sum of $5,865,339.00, or such other greater or lesser amount as is determined at trial.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all triable issues raised in this Complaint.

Respectfully submitted,

**BRADLEY M. CAMPBELL LLC**


/s/ Bradley M. Campbell

BRADLEY M. CAMPBELL LLC
  Bradley M. Campbell, Esq.
  Edward R. Bonanno, Esq.
50 West State Street, Suite 1100
Trenton, New Jersey 08608
609-392-4500
brad@bradcampbell.us
    *Attorneys for Plaintiffs Paulsboro Public Schools*
    *And the Borough of Paulsboro*

November 28, 2014

15